John J. McCANN

v.

COMMUNICATIONS DESIGN CORPO-
RATION, Oliver P. MacKinnon, Jr.,
Thomas E. Minogue, Jr., and Westing-
house Communications Software, Inc.

Civ. No. B–89–164 (JAC).

United States District Court,
D. Connecticut.

June 28, 1991.

James J. Murray, Guy Heinemann, Murray & Hollander, New York City, James Mulvey, Mulvey & Koratash, Danbury, Conn., for plaintiff John J. McCann.

Richard A. Horgan, Sheila A. Ozalis, Winthrop, Stimson, Putnam & Roberts, Stamford, Conn., for defendants Communications Design Corp. and Oliver P. MacKinnon, Jr.

James F. Stapleton, Joy Beane, Day, Berry & Howard, Stamford, Conn., for defendant Thomas E. Minogue, Jr.

Edward F. Hennessey, Katherine B. Larson, Robinson & Cole, Hartford, Conn., for defendant Westinghouse Communications Software, Inc.

RULING ON PLAINTIFF'S MOTIONS FOR RECONSIDERATION AND FOR RECUSAL

JOSÉ A. CABRANES, District Judge:

## CONTENTS

INTRODUCTION ........................................................ 1508
BACKGROUND ......................................................... 1509
DISCUSSION ........................................................... 1521
 A. The Discretion of the Court in Addressing Recusal Motions ........... 1521
 B. The Relevant Standards for Recusal .................................. 1522
 C. The Timeliness of Plaintiff's Recusal Motion ........................ 1524
 D. The Requirement that the Bias be Extrajudicial ..................... 1527
 E. The Merits of Plaintiff's Recusal Motion ............................ 1529
CONCLUSION ......................................................... 1533
 A. Motion to Recuse .................................................. 1533
 B. Motion for Reconsideration or in the Alternative for Certification ...... 1533

## INTRODUCTION

It is inherent in the judicial process that a district judge makes decisions that disappoint and, occasionally, agitate, one party or another. In this case, for example, a simple pre-trial decision to try the issue of the statute of limitations separately from the merits of plaintiff's claims—and thereby to limit discovery on the merits until the statute of limitations issue is resolved—has provoked an increasingly frantic and seemingly endless series of efforts by plaintiff to frustrate the purpose of the court's decision. Plaintiff's efforts have culminated now in a series of *ad hominem* attacks on the court and on opposing counsel and wholly fabricated charges of conspiracy, all in an effort to drive the "offending" judge out of the case. Plaintiff has even referred cryptically to "the darkness of [this court's] intentions," and yet the record of this case clearly demonstrates that, if anything, it has been a question of hostility displayed *toward* the judge—not *by* the judge.

It would be relatively easy to reassign this case; both practice and natural predisposition would suggest to many of us that where a party is sufficiently unhappy with the presiding judge to move for that judge's recusal, one proper course would be to have the case transferred to a colleague. But the simple truth is that it would be injurious to our entire system of justice to reward a party who has made serious and wholly unsupported allegations of bias by giving that party precisely what he wants. Where there is no basis for recusal other than a litigant's unhappiness

with a judge's decisions, the presiding judge has an obligation to prevent "judge shopping" by refusing to recuse himself. As the record here amply reflects, there is not the slightest doubt that plaintiff has received fair and impartial consideration of his views throughout the entire history of this case. To reassign this case based on this record would suggest to any disappointed litigant that he may have a case reassigned simply because the presiding judge has ruled against him. This would not only be grossly unfair to the defendants in this case, but it would send a dangerous signal to other litigants.

The ruling that follows may appear to be excessively fastidious, with several long extracts from hearing transcripts and other parts of the record. Plaintiff's accusations, however, require a meticulous response, and a review of the record is necessary in order to place in context the claims made in Plaintiff's Motion for Recusal of Hon. José A. Cabranes (filed May 20, 1991) ("Plaintiff's Recusal Motion") and Plaintiff's Motion for Reconsideration of the Order of April 29, 1991 or Alternatively for Certification Pursuant to 28 U.S.C. § 1292(b) (filed May 20, 1991) ("Plaintiff's 1991 Motion for Reconsideration").[1] The record speaks for itself.

It is unfortunate that so much time and energy has been expended by counsel and by the court in such an unproductive exercise. However, plaintiff's accusations are serious, and a complete and decisive answer is in the public interest and, more particularly, in the interest of our system of justice.

For the reasons stated below, Plaintiff's Recusal Motion is denied and Plaintiff's 1991 Motion for Reconsideration is granted. Upon reconsideration, the court adheres in substantial part to the Discovery Order entered on April 29, 1991 ("April 29, 1991 Discovery Order"). *See* Amended Discovery Order entered today.

## BACKGROUND

The complaint in this case was filed on March 28, 1989, and an amended complaint was filed on June 13, 1989. In the amended complaint, plaintiff alleges that he designed and developed a telephone management system called COM–NET in 1980 and 1981 in a joint venture with defendants Communications Design Corporation ("CDC"), Oliver P. MacKinnon, Jr. ("MacKinnon"), and Thomas E. Minogue, Jr. ("Minogue"). Plaintiff alleges that MacKinnon, with the aid and participation of Minogue, wrongfully deprived him of his ownership rights to COM–NET and of his rights to become a stockholder and director in CDC pursuant to an employment agreement. In April 1989, Westinghouse Communications Software, Inc. ("WCSI") purchased the assets of CDC with knowledge of the claims in the lawsuit that had been served on CDC, MacKinnon, and Minogue in March 1989. In June 1989, WCSI was served with the amended complaint and joined as a party to this action. Plaintiff claims that WCSI is derivatively liable for various actions of the other defendants and also claims that WCSI independently converted his property by virtue of its purchase.

Plaintiff asserts state law claims for breach of fiduciary duty, breach of contract, fraud, conversion, theft, equitable ownership, constructive trust and replevin, and federal law claims for violations of Section 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 7 C.F.R. § 240–10b–5, and of the Racketeer Influenced and

1. Plaintiff's seemingly inexhaustible determination to have me recuse myself is reflected in yet another letter (dated June 25, 1991) received in chambers on June 27, 1991. That letter raises the question of whether my affiliation with Yale University (I am a former general counsel and current trustee of the University and my wife is Professor of Law at the Yale Law School) means that I have "a financial interest in the subject matter in controversy or in a party to the procceeding" requiring my disqualification pursuant to 28 U.S.C. § 455(b)(4). The grounds for recusal raised in the June 25, 1991 letter will not be addressed in this ruling, for the recusal motion has been fully briefed and submitted for decision. I have asked all counsel of record, if they wish, to respond to the letter by no later than July 3, 1991. The issues raised in the June 25, 1991 letter will be deemed ripe for decision as of July 3, 1991.

Corrupt Organizations Act, 18 U.S.C. § 1962(c). Plaintiff also seeks a declaration under 28 U.S.C. §§ 2201 and 2202 of his rights to COM–NET and of his rights in CDC. Defendants CDC and MacKinnon have, in their Answer (filed Apr. 12, 1989), counterclaimed for interference with an expectancy and for abuse of process.

Defendants took the position early in this case that plaintiff's claims were barred by the applicable statute of limitations and the doctrine of laches. Consistent with that position, defendant WCSI filed a motion for protective order on August 17, 1989—as did defendants CDC and MacKinnon on September 11, 1989—seeking from the court an order preventing plaintiff from conducting discovery on matters unrelated to the statute of limitations and laches defenses. Plaintiff filed a written response on September 21, 1989 explaining the reasons for seeking the requested discovery. The court granted both motions for protective order at a hearing on September 27, 1989. *See* Transcript of Hearing of September 27, 1989 (filed Oct. 25, 1989) at 57–65. Pursuant to the colloquy with counsel at that hearing, an order was entered staying all discovery unrelated to the issue of the applicability of the statute of limitations to plaintiff's claims, and the order provided in pertinent part that "[n]o further discovery shall be allowed of the defendants [or of third parties] by plaintiff of any computer program tapes, listings, codes or other proprietary computer program designs or information.... The plaintiff may move to reconsider this protective order after ruling on Motions for Summary Judgment by defendants on the ground of statute of limitations." Order (entered Oct. 5, 1989) ("Order of October 5, 1989").

Defendants filed motions for summary judgment in December 1989. Following the filing of plaintiff's memoranda in opposition in February 1990, and then of defendants' reply memoranda in February and March 1990, and finally of plaintiff's surreply memorandum on March 14, 1990, the court heard oral argument on March 16, 1990; the court denied defendants' motions for summary judgment on May 25, 1990.

The court ruled that "[w]here, as here, plaintiff alleges that defendants affirmatively acted to conceal the facts necessary to establish his cause of action, the limitations periods for his claims commence to run at the time that he actually discovered his causes of action.... Establishment of actual knowledge is too inherently factual to provide a basis for [a] motion for summary judgment" (citations omitted). Endorsement Order (entered May 25, 1990).

Pursuant to the Order of October 5, 1989 staying discovery and permitting plaintiff to file a motion for reconsideration of the stay following a ruling on defendants' motions for summary judgment, plaintiff filed an "Omnibus Discovery Motion" on June 6, 1990. The court's decisions on this motion, and on defendants' request (in turn) for a protective order and bifurcation at trial of the statute of limitations question and the merits, are the source of the ensuing hulabaloo, including a wide array of efforts by plaintiff to undo the court's decision and, ultimately, to drive the presiding judge from the case. Plaintiff's Omnibus Discovery Motion requested additional discovery of witnesses related almost solely to the merits of plaintiff's case—that is, to issues other than defendants' statute of limitations and laches defenses. On July 26, 1990, defendant WCSI filed a memorandum in opposition to plaintiff's Omnibus Discovery Motion. And on July 27, 1990, defendant Minogue did the same. On August 1, 1990, plaintiff filed a reply memorandum in support of his Omnibus Discovery Motion.

On June 7, 1990, defendants filed a motion for a protective order and a Motion for a Separate Trial ("Separate Trial Motion") on those defenses. On June 11, 1990, plaintiff filed a memorandum in opposition to defendants' Separate Trial Motion, and on June 12, 1990, the court entered an order staying all discovery proceedings until after disposition of defendants' Separate Trial Motion. On June 26, 1990, plaintiff filed a motion for reconsideration of the court's stay of all discovery, and, on June 28, 1990, defendants filed a memorandum in opposition to plaintiff's motion for reconsidera-

tion. On June 28, 1990, plaintiff filed a memorandum in opposition to defendants' Separate Trial Motion; on July 9, 1990, defendants filed a reply memorandum in support of their Separate Trial Motion; and on July 17, 1990, the court granted plaintiff's motion for leave to file a surreply memorandum in opposition to defendants' Separate Trial Motion as well as defendants' motion for leave to file a rebuttal memorandum in support of the Separate Trial Motion.

On August 3, 1990, the court heard oral argument on all pending discovery motions and granted defendants' Separate Trial Motion (thereby effectively denying or making moot plaintiff's Omnibus Discovery Motion) in the following oral ruling:

> On the basis of the full record before me, I conclude that interests of expediency and economy would best be served by granting defendants' motion for separate trial on the issues of fraudulent concealment, fraudulent inducement and fiduciary relationship, in accordance with Rule 42(b) of the Federal Rules of Civil Procedure. Severance under Rule 42(b) is an appropriate tool to expedite the resolution of statute of limitations issues. See, for example, *Barnell vs. Paine Webber Jackson & Curtis[ ], Inc.*, 577 F.Supp. 976, 978 (Southern District of New York 1984).
>
> A separate trial of these issues may obviate the need for any further proceedings, which in light of the extent and nature of discovery envisaged in this case would result in a significant savings of time, money and judicial resources.
>
> See, for example, 5 Moore's Federal Practice, Paragraph 42.03[1] (2d Edition 1989).
>
> Accordingly, defendants' motion for separate trials is granted. It is so ordered.

Transcript of Hearing of August 3, 1990 (filed Aug. 9, 1990) ("8/3/90 Tr.") at 33–34. In light of that ruling, the court invited

> any application by the plaintiff to reopen discovery relevant to the projected first trial. And that motion will have to be filed by no later than August 10[,] accompanied by whatever memorandum is appropriate. It need not be extensive. I suggest that it not be extensive, in fact, relying on the record to the extent appropriate or necessary, and also with a view to the sort of trial which is envisaged.
>
> Then I will give defendants until August 17 to respond. And again I will look to counsel to reconstruct the record[ ] as appropriate and, importantly, to address the particular kind of discovery that is being sought.
>
> And I'm going to ask Mr. Heinemann[, counsel for plaintiff,] in his motion to be as explicit as possible as to what it is he wants, what ... he want[s] from whom, and why. And that would consist at a minimum, I would think, of a succinct paragraph on each target of discovery, with some clear explanation of why that person's testimony might be appropriate in the particular circumstances presented.

*Id.* at 45–46. Pursuant to that request, plaintiff filed a memorandum requesting additional discovery ("Plaintiff's Discovery Memorandum") on August 13, 1990. Plaintiff sought much of the same discovery that had been denied him in previous rulings and that he has since requested again in March 1991. Defendants filed memoranda in opposition to plaintiff's requests for additional discovery on August 17, 1990.

On August 20, 1990, plaintiff filed Plaintiff's Motion for Reconsideration of the Order of Separate Trials or, in the Alternative, for Certification of Questions Pursuant to 28 U.S.C. § 1292(b)[2] ("Plaintiff's

---

**2.** 28 U.S.C. § 1292(b) provides, in pertinent part, that

> [w]hen a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially

advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order.

1990 Reconsideration Motion"). On August 27, 1990, defendants CDC and MacKinnon filed a memorandum in opposition to Plaintiff's Reconsideration Motion. On September 4, 1990, plaintiff filed a reply memorandum.

On September 10, 1990, the court endorsed Plaintiff's Discovery Memorandum in pertinent part as follows: "Treating this memorandum as a motion to reopen discovery relevant to the first part of the projected bifurcated trial, it is hereby DENIED upon full review of the record." Also on that date, the court endorsed Plaintiff's 1990 Reconsideration Motion in pertinent part as follows: "Plaintiff's motion for reconsideration is GRANTED. Upon reconsideration, the court ADHERES to its decision of August 3, 1990. Plaintiff's motion in the alternative for certification of the questions involved, pursuant to 28 U.S.C. § 1292(b), is DENIED substantially for the reasons stated in Defendants' Memorandum in Opposition to Plaintiff's Motion for Reconsideration or for Certification...."

On October 9, 1990, plaintiff filed a Notice of Appeal. And on October 18, 1990, this court stayed all pre-trial proceedings pending a ruling on plaintiff's appeal. On November 9, 1990, our Court of Appeals denied plaintiff's petition for a writ of mandamus and granted defendants' motion to dismiss the appeal. *See* Mandate Orders issued on November 9, 1990 (filed Nov. 19, 1990) (unpublished).

On December 17, 1990, plaintiff filed a Motion for Leave to Depose and Subpoena Thomas W. Bucci ("Bucci Discovery Motion"). Defendants' December 18, 1990 opposition to plaintiff's motion for leave to depose and subpoena (formally filed by the Clerk on January 7, 1991), was followed on December 20, 1990 by plaintiff's reply memorandum. The Bucci Discovery Motion contained no indication that plaintiff desired, or that the motion required, any sort of expedited consideration by the court. However, in a letter to this court dated January 25, 1991 (and docketed by the Clerk on February 27, 1991) ("Murray Letter of January 25, 1991"), co-counsel for

plaintiff, James J. Murray, wrote as follows:

> I am co-counsel for the plaintiff John McCann, and write because of a need for immediate action on one of the several pending motions. I understand that you have been ill....
>
> . . . . .
>
> The reason that plaintiff's motion requires immediate judicial attention is the fact that until the Court acts essential documents will remain entirely outside the control of the Court and the plaintiff. These documents are subject every day to inappropriate disposition, and informal attempts to secure their preservation have failed. Lack of immediate judicial action is likely to adversely affect the ability of a jury to consider highly relevant facts at trial.
>
> Additionally, of course, we would like to proceed with this discovery now while other matters are still pending, so that the requested discovery will not cause any delay in trial.
>
> We therefore respectfully ask that you rule upon, and grant, the motion permitting plaintiff to subpoena Mr. Bucci, so that we can safeguard the documents and obtain Mr. Bucci's testimony with respect thereto as soon as possible.
>
> We do not wish to trouble you unduly during your recovery. If your health does not permit you to immediately consider and resolve this one important matter, we would respectfully request that you refer it to another judge, or to a magistrate.

Murray Letter of January 25, 1991 at 1–2 (emphasis omitted).

In a letter dated January 28, 1991 (and docketed by the Clerk on February 27, 1991) ("Stapleton Letter of January 28, 1991"), counsel for defendant Minogue, James F. Stapleton, wrote to the court in response to the Murray Letter of January 25, 1991 in pertinent part as follows:

> Mr. Murray's assertion in his letter that "Mr. Bucci has in his possession critical documents which [plaintiff has] been seeking since the filing of this case" is utterly without any factual basis. But

even this ... assertion does not explain why plaintiff needs "immediate judicial attention" for a motion that seeks to reopen discovery to take the deposition of a witness whose location and identity the plaintiff has known since at least July 1989....

Mr. Murray has waited six weeks since filing the motion to advise the Court that he is seeking "immediate judicial attention." His letter gives absolutely no reason why resolution of the motion suddenly acquires such urgency. One can only surmise that since plaintiff's previous motions to re-open discovery have been denied, Mr. Murray hopes that his suggestion that the matter be assigned to another Judge or a Magistrate will be followed. In light of the fact that the motion is pending before you and that you are well acquainted with the issues in this case, there is no reason why resolution cannot await your return to the bench. Accordingly, on behalf of the defendant Thomas E. Minogue, Jr., we oppose any reassignment of the plaintiff's motion to re-open discovery to take Mr. Bucci's deposition.

Stapleton Letter of January 28, 1991 at 1–2.

On January 31, 1991, Chief Judge Ellen Bree Burns—presiding in my absence due to illness—referred the Bucci Discovery Motion to Magistrate Judge Joan Glazer Margolis for decision, but on February 4, 1991, Magistrate Judge Margolis entered the following order regarding the Bucci Discovery Motion: "With permission of Judge Cabranes' Chambers, the reference to this Magistrate is hereby REVOKED."

In a letter dated that same day, February 4, 1991 (and docketed by the Clerk on February 27, 1991) ("Murray Letter of February 4, 1991"), counsel for plaintiff wrote to Chief Judge Burns

in order to request reassignment of the case to a judge who is able to devote immediate substantive attention to it, because of Judge Cabranes' recent illness and the consequent deferral of cases on his docket.

The reason for our request is not simply a plaintiff's normal urge to get on with the trial. Rather, our request grows out of the peculiar procedural status of this case. This case has been bifurcated into separate trials on separate issues, with no non-party discovery by plaintiff being permitted until after the first trial.

This circumstance makes a prompt "first" trial absolutely essential because the documents and memories sought to be discovered have now been deferred for one and a half years, with no end to such deferral in sight. I have been advised that some such documents in the hands of third parties have already been lost and may continue to be unless discovered.

Murray Letter of February 4, 1991 at 1.

After this court scheduled a status conference and hearing on the Bucci Discovery Motion and all pending matters for March 4, 1991, plaintiff's counsel submitted a status report ("Plaintiff's Status Report") on February 20, 1991 (docketed by the Clerk today). Plaintiff also provided a copy of Plaintiff's Status Report to Chief Judge Burns, "in the hope that it might be of assistance to [her] in determining the reassignment" request. Letter of James J. Murray to the Honorable Ellen Bree Burns dated February 20, 1991 (and docketed by the Clerk on February 27, 1991) ("Murray Letter of February 20, 1991"). The submission of Plaintiff's Status Report reveals, by implication, that plaintiff was still pressing the request to Chief Judge Burns for re-assignment of the case to another judge, notwithstanding the fact that a hearing before me had by that time already been scheduled for March 4, 1991. Plaintiff's Status Report emphasized, among other things, "that any further delay beyond the one-and-one-half year stay of discovery would be extremely prejudicial and [would] irreparably harm plaintiff. Already, counsel for plaintiff has been advised by several non-parties that material documentation has already been routinely discarded. With still more time to go until such discovery is finally permitted, more such evidence will surely be lost." Plain-

tiff's Status Report at 5–6 (footnote omitted).

In a letter dated February 22, 1991 (and docketed by the Clerk on February 27, 1991) from Chief Judge Burns to James J. Murray, Chief Judge Burns wrote as follows: "I am pleased to report that Judge Cabranes has recovered from his illness and has returned to his judicial duties. Under these circumstances I consider your request that the above-captioned matter be assigned to another judge to be moot."

At the hearing and status conference on the morning of Monday, March 4, 1991, the court began by enumerating the pending motions, including the Bucci Discovery Motion, and then asking whether there was "any other motion or application of which I'm not aware[.]" Transcript of Hearing of March 4, 1991 (filed Apr. 30, 1991) ("3/4/91 Tr.") at 6. Whereupon, the following colloquy with counsel took place:

MR. HEINEMANN: ....

If your Honor please, this morning we delivered to chambers a letter from Mr. Murray, co-counsel, together with an affidavit and an exhibit to that affidavit, under seal. It is our request that your Honor consider what we have raised in those papers immediately because we think that—

THE COURT: Let me ask the Clerk what this is about, whether they know anything about it.

We haven't seen it, I'm afraid. It hasn't reached us.

MR. HEINEMANN: We gave it to the guard this morning and we were assured that it would be brought to chambers, your Honor.

THE COURT: My clerk has just gone out. We will find out.

MR. HEINEMANN: I would be grateful if your Honor could take a look at that before—

THE COURT: Do you have a second copy?

MR. HEINEMANN: Yes.

THE COURT: None of this has been served on opposing counsel?

MR. HEINEMANN: It has been this morning, your Honor. It relates to some documentary evidence we received at five o'clock last Friday evening [from "Rapid American" Corporation or "RAAM"]. And Mr. Murray describes that document in his affidavit.

THE COURT: Why don't you give me a chance—Mr. Murray has been good enough to pass up his letter of March 4, 1991, his photocopy. If I could just read that. Hold on a second.

(Pause)

THE COURT: I have before me, in addition, a four-page affidavit with an Exhibit A, and if you would bear with me, I will now read that.

(Pause)

THE COURT: It says: "The documents in question are submitted herewith as Exhibit A under seal with the request that the Court consider them in camera."

The copy of the exhibit that's been conveyed to opposing counsel, does it include Exhibit A?

MR. HEINEMANN: It does not include the exhibit. It includes the affidavit, but not the exhibit.

....

Your Honor, may I speak to the point we raised by Mr. Murray's letter and affidavit?

THE COURT: Yes.

MR. HEINEMANN: Thank you very much, your Honor.

Your Honor, we would characterize what Mr. Murray has described in his affidavit and Exhibit A that is contained in that and submitted for now under seal as a bombshell in this litigation. Indeed, those documents constitute the most dramatic documentary evidence of the very issue that your Honor has separated for the first trial, the fraudulent concealment by the defendants that goes to the heart of the issue, or what did they do to keep from McCann what was going on with respect to the progress of the COM[–]NET program.

The documents that are contained in Exhibit A were, in part, covered by discovery requests of the defendant CDC.

They were not produced by CDC, or else we would, of course, have had them long ago.

This document, and other documents similar to it, in the hands of non-parties whom we have been stayed from taking discovery from, are in the process of being destroyed and discarded in conjunction with the normal document destruction programs of a number of entities and, in some cases, individuals.

THE COURT: How do you know that?

MR. HEINEMANN: Mr. Murray was advised on Friday, or a bit earlier last week, by the individual with whom he spoke who produced the documents which we finally got on Friday evening. In fact, I happened to be in Mr. Murray's office when the messenger brought them at five o'clock. And that person, and the organization with which he is affiliated, have no interest in maintaining such things.

. . . .

MR. HORGAN: Your Honor, on behalf of defendants MacKinnon and CDC. . . . I would like to call the Court's attention that the only putative ground, the only ground alleged in the affidavit in justification of the in camera submission to which we do object is, we believe, a totally unsubstantiated statement that, reading from paragraph 6 of Mr. Murray's affidavit of March 2, "disclosure at this time of the Exhibit A documents upon information and belief would result in defendants stopping further information from coming to me and would lead directly to the destruction of many important evidentiary materials."

Now, I don't know what Mr. Murray intends to imply by those remarks, but there has been no claim, no suggestion, no intimation at any time prior that the— collectively now—that the defendants have failed in any way to honor our disclosure obligations or the orders of the Court.

. . . .

THE COURT: What is it that [plaintiff's counsel] seek as a result of this submission? Assuming for the argument only that the Court is persuaded that you ought to be given an opportunity to conduct further discovery—which I take it is what you're seeking?

MR. HEINEMANN: That is what we're seeking your Honor.

THE COURT: Assuming that the Court agrees with that application, what is it that you would do?

MR. HEINEMANN: Well, first of all, your Honor, if we successfully persuade your Honor that we should have the opportunity for more discovery, I believe that much, if not all, of everything else that is now pending before your Honor would be irrelevant for the moment; that is to say, certain of the motions that have been made and certain of the in limine motions and details about pretrial procedures would, I think, abide the events that would come our way by further discovery. Certainly, I don't think your Honor would want to rule on any of those motions without having the discovery that we hope to obtain, if your Honor agrees that more discovery should be permitted to plaintiff.

THE COURT: Yes, sir?

MR. HORGAN: If your Honor please, this is the latest in a lengthy series of plaintiff's attempts to obtain additional discovery.

On four prior occasions—I don't know what Exhibit A has to do with it, your Honor, putting that aside for the moment. On four prior occasions before this Court, plaintiff has sought additional discovery. In each case it has been denied.

Prior to the summary judgment motion, he said he needed additional discovery to prepare for that. He said what he needed. We briefed it, we argued it. Your Honor ruled that summary judgment motion could proceed, and to the effect that there was then requested discovery not germane to the statute of limitations issues.

In June, 1990, in an omnibus discovery motion, they again sought the same discovery which defendants succeeded in

convincing the Court relates to the merits of the case, not the issues severed.

After, as your Honor pointed out earlier today, after the Court ordered the separate trial in an order from the bench on August 3, plaintiff again sought additional discovery by an August memorandum, and that led to this Court's order of September 10, saying no showing has been made of any necessity for any additional discovery.

And it was certainly raised on the appeal in the mandamus papers and got nowhere.

And here we are again with yet another attempt, your Honor.

Another point that I would urge is that from the papers, Mr. Murray's affidavit of March 2, the subject ... matter of these documents relates to this tired, shop-worn issue of use. And the point for the separate trial, your Honor, is that no matter what discovery the plaintiff finds on the subject of use, his claims are still time-barred.

The purpose of the motion—excuse me—the purpose of the statute of limitations separate trial is to determine what McCann knew and when he knew it, and the affidavit that Mr. Murray has submitted describes evidence that goes to the merits.

Now, the new contention in the papers submitted [in Plaintiff's Status Report] and the most recent is a new theory, your Honor. They now say they need discovery because of the concern of the destruction of documents.

Now, if that is the genuine concern, the defendants are prepared to work out a sensible procedure to handle that. There are a variety of ways that [this] can be handled. If they want to, for example, through document production, obtain from these companies that are allegedly about to destroy documents, we don't know which ones they are and if they are, but assuming they are, they could get the documents produced, they could be produced and put under seal, they could be given to an escrow agent and held. Because all of these, based on the descriptions to date, relate to merits issues, have nothing to do with the three issues severed for trial.

And the defendants view this as just another attempt to derail and delay the separate trial your Honor has ordered.

So we're perfectly prepared to work out a sensible non-destruction procedure, if that is what is the heart of this, which is the stated reason. We need not delay the separate trial your Honor has ordered.

THE COURT: Mr. Heinemann?

MR. HEINEMANN: Yes, your Honor.

We respectfully request a brief opportunity to demonstrate in camera in more detail what Mr. Murray intended to convey with respect to the availability of documents, and we firmly believe that we will demonstrate to your Honor the materiality of such documentation and, therefore, such discovery, even for the first trial that your Honor has ordered. 3/4/91 Tr. at 6–17.

The court then granted plaintiff's oral motion for an *ex parte* hearing, which took place in the afternoon of March 4, 1991 and at which the following colloquy took place:

THE COURT: ...

My very simple concern at this point is why should Exhibit A remain under seal? Why shouldn't I make Exhibit A available to defendants' counsel this afternoon, and then let them submit response papers in anticipation of the projected hearing on Thursday?

MR. HEINEMANN: We have no problem with that, if your Honor is granting us the right to subpoena these parties. And the only reason that we asked that it be kept from them.

THE COURT: Why should I make a decision on the merits of your application before I've given them an opportunity to be heard on the application?

MR. HEINEMANN: I'm not asking that your Honor—

THE COURT: Why don't I let them respond, having seen Exhibit A, and then on the basis of a full record I can and will make a decision as to whether this

record compels me to reconsider this issue in the way that you ask me to do?

MR. HEINEMANN: May I just have a moment, your Honor?

THE COURT: Yes.

(Pause)

MR. HEINEMANN: Your Honor, the only reason for nondisclosure of the Exhibit A is the fact that on the prior occasion I alluded to, counsel, acting perhaps in good faith but with the effect of keeping us from material evidence, persuaded a third party not voluntarily to give us documents they otherwise were prepared to give us.

If—

THE COURT: This is not such a case, is it?

MR. HEINEMANN: It could well be. They could call Rapid American and say you were a licensee of ours in 1981 and under the clause you're not supposed to disclose things, and we'd—

THE COURT: Well, we don't know— This is all entirely speculative. If you prevail in your application, I'm going to order or permit you to proceed to get this information from Rapid American. I don't understand what they could possibly do to impede an order of this Court.

. . . .

. . . I mean if you're not permitted to have any reopened discovery, is it not possible for me to issue some kind of an order which would protect your client?

MR. HEINEMANN: Yes, absolutely, your Honor. If your Honor would merely direct, for instance, in the interim, while we consider the motion, that they not contact Rapid American until the ruling, that would be fine. That's the only reason we put it under seal, your Honor.

. . . .

THE COURT: Well, the defendants have said on previous occasions, I believe, that they were prepared to protect documents within their reach against destruction. I don't see any reason to doubt that they would repeat those representations.

Do you require anything else?

MR. HEINEMANN: They never said that, your Honor, until this morning. In fact, they resisted a form of order we submitted to your Honor in October of 1989 that would have permitted us to serve subpoenas for that period to ensure—

THE COURT: Well, they said it today.

MR. HEINEMANN: They did say it today.

THE COURT: And so is that enough?

MR. HEINEMANN: Well, your Honor, we hoped by presenting you with these documents to persuade you that we should have the[m] right now, in preparation for the first trial, to get the [subpoenas] to take the [discovery].

THE COURT: Until I've given them an opportunity to reflect on what you've brought to our attention and to comment on it, I don't see any basis for my acting at all.

3/4/91 Tr. at 32–35.

The court thereafter unsealed Exhibit A so that defendants' counsel could review the RAAM documents. Then, with all counsel present, the court treating the Affidavit of James J. Murray and Exhibit A attached thereto as a renewed request by plaintiff to reopen discovery ("Plaintiff's Motion to Reopen Discovery"), gave defendants until March 6, 1991 to file a response to plaintiff's motion. Defendants did so, and plaintiff filed a reply memorandum on March 7, 1991, the day on which a hearing was held to address pending discovery motions, including Plaintiff's Motion to Reopen Discovery and the Bucci Discovery Motion.

On March 7, 1991, the court was unable to hear oral argument on the pending discovery matters because of questions raised with respect to plaintiff's counsel's failed efforts at executing service of the court's order and subpoena on Rapid American. *See generally* Transcript of Hearing of March 7, 1991 (filed Mar. 12, 1991) ("3/7/91 Tr."). The court therefore postponed final resolution of the issue of what further discovery, if any, was going to be permitted before the first trial. *Id.* at 15. However, with respect to pending discovery motions, the court made abundantly clear its then-

current intention to deny plaintiff's motion for further discovery:

Let me say at the threshold that I've reviewed these papers with care. On the basis of the record now before me, I have no present intention of lifting or vacating the stay that's now in effect. I have no—I am generally persuaded by the arguments that have been put forward by defendants in their papers.

*Id.* at 15. And later the court added:

I would want, by no later than March 22, the final comments on this question about reopening discovery, [in no more than] seven pages. Seven pages, absolute maximum.

Now, what I would want from Mr. Heinemann and Mr. Murray at that time is this, and what I'm asking for perhaps will be informed by my comments today indicating that at least at this point I have a threshold disposition to deny their motion. And let me say that part of the problem here is that it appears to me that in dealing with the question of any possible discovery on the issues involved in the first of the projected trials that the plaintiff has invariably presented it in a way which suggested a massive undertaking and one which effectively broke down the distinction between the first trial and second trial.

So what I'm going to do is give Mr. Heinemann and Mr. Murray an opportunity to submit to me a form of proposed order which would accommodate their interests, bearing in mind the Court's decision to bifurcate these trials. And hopefully this will be a list of proposed depositions which would not do what I fear they might have been trying to do earlier, and which is clearly limited to the subject matter of the first trial.

In other words, I want to get a very clear and precise idea of the scope of the discovery which Mr. Heinemann and Mr. Murray have in mind. And I also want to have from them some idea in that brief memorandum that I suggested of how long it would take to have that discovery before the first of these trials. I want to know how much, and how long,

and why. Those three things. Do not be elaborate; you can give it to me in short paragraphs.

. . . .

Then I'll give the defendants' counsel until the 28th, almost a week later, to respond to your memorandum and to your proposed additional discovery. They'll be able to give me an idea, presumably, of why they think one or another item of the proposed discovery is inappropriate or why all of it is inappropriate.

. . . .

Why don't we give the deadline for Mr. Heinemann and Mr. Murray of April 5. Friday, April 5. And then we'll give defendants' counsel until Friday, April 12.

. . . .

Now, we've had lots of discussion of this over many months in the past, many hearings on this question. This is not the first time these issues have arisen. Nevertheless, I'm willing to hear the argument again and I am not closing my mind.

I want to give each of you the benefit of a final chance to explain what is going on, but I also want to be candid with you so you know exactly what my inclination is so that there's no confusion on this score and so that you know exactly what you're dealing with.

But I think what we have to do [with regard to the failed attempts by plaintiff's counsel to serve Rapid American Corporation] is sort out what happened in this particular episode, give each of you an opportunity to explain yourselves to each other and to me, so that the record is entirely clear, and then we'll proceed with some more information regarding the possible discovery this might take.

And I say this in part not because I think there's any particular merit necessarily in the plaintiff's arguments for additional discovery, but because I'm mindful of the fact that as a practical matter the trial of this action is unlikely to come up for another few months.

And so the question arises as to how much discovery might be possible to accommodate plaintiff's asserted interests, even if the defendants don't believe there's any merit[ ] in their claim.

So what I'm asking defendants to think about in the coolness of the next month or so is whether having gone through all of this, whether it might not be in their interests and in the interests of all of us, as well as the plaintiff, to at least give them the opportunity to do the discovery, some discovery that they claim is relevant to the first trial which continues to be a matter of dispute.

*Id.* at 24–30.

On April 5, 1991, plaintiff filed a memorandum requesting additional discovery together with a proposed form of order. ("Plaintiff's April 5, 1991 Memorandum and Proposed Order"). On April 12, 1991 defendant WCSI filed a response and defendants CDC and MacKinnon filed a response together with a proposed form of order ("Defendants' First Proposed Discovery Order"). On April 17, 1991, plaintiff filed a motion for permission to file a reply memorandum ("Plaintiff's April 17, 1991 Reply") of four pages in length. On April 19, 1991, the court granted that motion. On April 29, 1991, defendants sought permission to file their sixteen-page surreply memorandum ("Defendants' April 29, 1991 Surreply") together with a proposed form of order ("Defendants' Revised Proposed Discovery Order"). The court granted defendants' motion and entered Defendants' Revised Proposed Discovery Order ("April 29, 1991 Discovery Order"), thereby granting in part and denying in part plaintiff's requests for additional discovery.[3]

On May 3, 1991, plaintiff's counsel wrote this court describing their astonishment with respect to the content of the April 29, 1991 Discovery Order and with the fact that they "were given no opportunity to be heard while defendants were so readily permitted ... to expand their own briefing."

Letter from James J. Murray and Guy L. Heinemann dated May 3, 1991 (and docketed by the Clerk on May 7, 1991) ("Plaintiff's Letter of May 3, 1991") at 1. Plaintiff's counsel wrote:

As your Honor knows from our prior submissions, both here and in the Court of Appeals, from our perspective a number of your rulings appear arbitrary and capricious, and seem to unfairly favor the defendants. We do not think our view is a reflection of the limits of our own experience, or the fact that we come from another district. We have discussed the problem with a number of our colleagues, some with judicial, academic and bar association experience, and a broad range of litigation expertise, and they too are perplexed.

Plaintiff's Letter of May 3, 1991 at 1. That letter went on to request, among other things, that this court articulate its views related to the discovery issues in this case by answering fourteen pointed and accusatory questions propounded by plaintiff's counsel. In addition to demanding that the court respond to these extraordinary, if not unprecedented, series of questions (*e.g.*, "Did your Honor consider the differences between the defendants' first proposed order ... and ... the defendants' second proposed order, upon which plaintiff was not permitted to comment at all? Were some of those differences requested by the Court of defendants, and if so which, why, when and how?"), plaintiff's counsel also requested a stay of discovery by defendants and an extension of time in which to submit a motion for reconsideration. No mention was made of any recusal motion.

On May 7, 1991, the Court entered an order ("May 7, 1991 Order"), which, among other things, granted plaintiff's application for an extension of time in which to file a motion for reconsideration and providing a schedule for submissions of counsel regarding issues raised by Plaintiff's Letter of May 3, 1991.[4] On May 14, 1991, pursuant

---

**3.** A copy of the April 29, 1991 Discovery Order is attached as an Appendix to this ruling.

**4.** The May 7, 1991 Order provided in pertinent part as follows:

1. The Clerk shall docket the attached letter dated May 3, 1991 from plaintiff's attorneys.

to the May 7, 1991 Order, defendants CDC and MacKinnon submitted their Memorandum in Response to Messrs. Murray's and Heinemann's Letter to the Court Dated May 3, 1991 ("Defendants' Response to May 3 Letter"), which addresses each of the fourteen questions propounded to the court by plaintiff's counsel in Plaintiff's Letter of May 3, 1991 and concludes that "plaintiff's counsel's real purpose behind their letter is to create a record for appellate review or other judicial action and to further delay the trial of the issues severed for a separate trial." Defendants' Response to May 3 Letter, at 2.

On May 20, 1991, plaintiff filed Plaintiff's 1991 Motion for Reconsideration. Also on that date, plaintiff filed Plaintiff's Recusal Motion, which moves pursuant to 28 U.S.C. §§ 144 and 455 that I disqualify myself from hearing and determining Plaintiff's 1991 Motion for Reconsideration and all other aspects of this case. Together with Plaintiff's Recusal Motion, plaintiff filed Plaintiff's Affidavit in Support of Motion to Recuse ("Plaintiff's Affidavit") and Plaintiff's Memorandum of Law in Support of the Motion for Recusal of Judge Cabranes ("Plaintiff's Recusal Memorandum"). On May 28, 1991, defendants CDC and MacKinnon filed their Memorandum in Opposition to Plaintiff's Motion for Recusal ("Defendants' Opposition to Recusal") and a memorandum in opposition to Plaintiff's 1991 Motion for Reconsideration. Also on that date, defendant WCSI filed a response to Plaintiff's 1991 Motion for Reconsideration; on June 3, 1991, WCSI also filed a memorandum of law in opposition to Plaintiff's Recusal Motion. On May 31, 1991, the court granted plaintiff's request for an extension of time in which to file a reply to defendants' responses to Plaintiff's Recusal Motion and Plaintiff's 1991 Motion for Reconsideration—allowing plaintiff until June 7, 1991 to file his reply and defendants until June 12, 1991 to file their surreply, which were filed in accordance with that schedule.

Accordingly, as of June 12, 1991, Plaintiff's Recusal Motion and Plaintiff's 1991 Motion for Reconsideration were fully submitted and ripe for decision.[5]

Before considering Plaintiff's Recusal Motion, it is important to note several conclusions that can safely be drawn from this extensive, but ultimately quite clear, record.

First, since the Fall of 1989, all counsel had received ample, and arguably excessive, opportunities to inform this court of their views through motions, memoranda, affidavits, and oral argument on the issue of what additional discovery, if any, should be permitted on the statute of limitations issues to be addressed in the first part of the projected bifurcated trial.

Second, although the type of discovery that plaintiff has requested over that time has not changed significantly, plaintiff's purported justification for requesting the discovery has been in constant flux: Plaintiff initially argued that the discovery he sought was relevant to the issues that have been severed for the first trial;[6] plaintiff next argued that the discovery was necessary to prevent document destruction prior

---

2. Treating the attached letter of May 3, 1991 as an application for an extension of time in which to file a motion for reconsideration or for other relief, plaintiff's motion is GRANTED: Any such motion shall be served and filed by May 20, 1991, and any response thereto shall be served and filed by May 28, 1991. *See* Rule 9(a)(2), Local Rules of Civil Procedure (D.Conn.). A reply brief may be served and filed by no later than May 31, 1991; a sur-reply brief may be served and filed by June 3, 1991.

3. In the meantime, other counsel of record shall be free to comment on the attached letter of May 3, 1991 as they may deem appropriate, up to and including May 14, 1991.

4. As part of the briefing on any motion for reconsideration or other relief, counsel are invited (as in the past) to submit to the court for its consideration a proposed form of order that would accomplish objectives that, in their view, are appropriate or necessary in the circumstances; opposing counsel would, of course, be expected to comment on any such proposed order.

5. All discovery shall be stayed until further order of the court.

5. *See supra* note 1.

6. *See supra* text at 1510–12.

to the second trial;[7] plaintiff then requested that a pending discovery motion and later the entire case be reassigned to another judge because progress toward trial was being unduly delayed by my absence because of my illness this winter;[8] and plaintiff now argues that this court should disqualify itself from ruling on Plaintiff's 1991 Motion for Reconsideration of previous discovery rulings and from any other action involving this case because of this court's alleged prejudice against plaintiff.[9]

The third conclusion that is clear from this record is that plaintiff's purported justifications for seeking additional discovery have been inconsistent with plaintiff's actions. For instance, plaintiff continued to press his request that Chief Judge Burns reassign this case to another judge—on the stated grounds that the then-pending Bucci Discovery Motion needed to be addressed on an emergency basis (a claim not made in the motion itself) and that my illness might somehow further delay progress of the case toward trial—notwithstanding the fact that plaintiff understood, as confirmed by the submission of Plaintiff's Status Report, that a status conference and hearing on all pending motions was scheduled to take place before me on March 4, 1991, less than eight business days from the date of plaintiff's letter to Chief Judge Burns. *See* Murray Letter of February 20, 1991. Similarly, although a primary justification for plaintiff's request that the case be transferred to another judge was plaintiff's purported concern that the case go to trial as soon as possible, *see* Murray Letter of February 4, 1991, that justification is belied by the fact that plaintiff's endless series of motions, each requesting substantially the same discovery, has been the chief source of delay. It is one thing that plaintiff's motions have caused significant delay in this case; but it is quite another for plaintiff to argue that the case should be reassigned to another judge because the case has progressed too slowly to trial.[10]

Finally, plaintiff's professed concern that discovery related to the second trial is on the verge of destruction is also belied by plaintiff's actions. In none of plaintiff's motions—including Plaintiff's Recusal Motion and Plaintiff's 1991 Motion for Reconsideration—has plaintiff proposed or moved for a court order that would protect the materials he purportedly fears are about to be destroyed.[11] Plaintiff has not moved, *even in the alternative,* for such an order; nor has he moved for such an order pending the outcome of Plaintiff's Recusal Motion. And that is true notwithstanding the fact that defendants have stated on the record that they would be willing to work out with plaintiff a procedure for addressing that asserted concern. 3/4/91 Tr. at 16–17.

## DISCUSSION

### A. *The Discretion of the Court in Addressing Recusal Motions*

 Plaintiff requests that I recuse myself on the basis of 28 U.S.C. §§ 144 [12]

---

7. *See supra* text at 1512–13.

8. *See supra* text at 1513–14.

9. *See supra* text at 1519–20.

10. Plaintiff continues to complain, for example, that during the time … [it takes for Plaintiff's Recusal Motion to be fully addressed] defendants' scheme of delay while evidence is destroyed will have worked, and there will be no additional evidence with which plaintiff can demonstrate his case to the trial jury. The resulting "sense of futility" and frustration of justice in this regard should not be imposed by this court on any litigant. Plaintiff's Recusal Reply Memorandum at 30; *see also id.* at 19; Murray Letter of February 4, 1991 at 1.

11. It should also be noted that, although plaintiff has repeatedly claimed that documents are being destroyed, *see, e.g.,* Plaintiff's Status Report at 6 ("counsel for plaintiff has been advised by several non-parties that material documentation has already been routinely discarded"), plaintiff has yet to offer any verified or verifiable information to support that claim.

12. Section 144 provides as follows:

Whenever a party to any proceeding in a district court makes and files *a timely and sufficient affidavit* that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

and 455 [13] ("section 144" and "section 455," respectively). The decision whether to grant a recusal motion is a matter confided to the sound discretion of the district court. *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1312 (2d Cir.1988), *cert. denied* 490 U.S. 1102, 109 S.Ct. 2458, 104 L.Ed.2d 1012 (1989); *Apple v. Jewish Hosp. and Medical Center*, 829 F.2d 326, 333 (2d Cir. 1987). As noted by the Court of Appeals:

> The judge presiding over a case is in the best position to appreciate the implications of those matters alleged in a recusal motion. In deciding whether to recuse himself, the trial judge must carefully weigh the policy of promoting public confidence in the judiciary against the possibility that those questioning his impartiality might be seeking to avoid the adverse consequences of his presiding over their case.... Litigants are entitled to an unbiased judge; not to a judge of their choosing.

*In re Drexel Burnham Lambert Inc.*, 861 F.2d at 1312 (citation omitted).

> The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed *not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time.* A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.
> (emphasis added).

**13.** Section 455 provides in pertinent part as follows:

> (a) Any justice, judge or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
> (b) He shall also disqualify himself in the following circumstances:
> (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;
> (2) Where in private practice he served as a lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;

## B. The Relevant Standards for Recusal

A recusal motion is a serious matter, "strik[ing] at the integrity of the judicial process." *In re International Business Machs. Corp.*, 618 F.2d 923, 927 (2d Cir.1980) (*"In re IBM"*). Recusal motions should not be used as "strategic devices to judge shop." *Lamborn v. Dittmer*, 726 F.Supp. 510, 515 (S.D.N.Y.1989); *see Apple*, 829 F.2d at 335. The judge to whom a recusal motion is addressed is presumed to be impartial, *United States v. International Business Machs. Corp.*, 475 F.Supp. 1372, 1379 (S.D.N.Y.1979) (*"United States v. IBM"*), *aff'd*, 618 F.2d 923 (2d Cir.1980); *Wolfson v. Palmieri*, 396 F.2d 121, 126 (2d Cir.1968), and there is a substantial burden on the moving party to show that the judge is not impartial. *Lamborn*, 726 F.Supp. at 514; *United States v. IBM*, 475 F.Supp. at 1379.

A judge must be free to make rulings on the merits without the apprehension that if he makes a decision, even a disproportionate number of decisions, in favor of one litigant, he may have created the impression of bias. *In re IBM*, 618 F.2d at

> (3) Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;
> (4) He knows that he, individually, or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;
> (5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:
> (i) Is a party to the proceeding, or an officer, director, or trustee of a party;
> (ii) Is acting as a lawyer in the proceeding;
> (iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;
> (iv) Is to the judge's knowledge likely to be a material witness in the proceeding.
> (c) A judge should inform himself about his personal and fiduciary financial interests, and make a reasonable effort to inform himself about the personal financial interests of his spouse and minor children residing in his household.

929. It is vital to the integrity of the system of justice that a judge not recuse himself on unsupported, irrational or highly tenuous speculation, *Hinman v. Rogers,* 831 F.2d 937, 939 (10th Cir.1987), and he "is as much obliged not to recuse himself when it is not called for as he is obliged to when it is." *In re Drexel Burnham Lambert Inc.,* 861 F.2d at 1312.

Section 144 provides that a judge shall recuse himself when a party has filed a timely and legally sufficient affidavit showing that the judge before whom the matter is pending has a personal prejudice against the party or a bias in favor of any adverse party. Section 455(b) enumerates five instances which mandate the disqualification of a judge; [14] the only subdivision relevant to this case is 455(b)(1), which requires recusal where a judge "has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding."

Courts have held that sections 144 and 455(b)(1) should be construed *in pari materia. United States v. Pugliese,* 805 F.2d 1117, 1125 (2d Cir.1986); *Lamborn,* 726 F.Supp. at 514; *Apple,* 829 F.2d at 333.

■ Section 455(a) [15] provides that a judge shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned. Section 455(a) "establishes an objective standard 'designed to promote public confidence in the impartiality of the judicial process.'" *In re Drexel Burnham Lambert Inc.,* 861 F.2d at 1313 (*quoting* H.R.Rep. No. 1453, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.C.C.A.N. 6351, 6354–55); *Liljeberg v. Health Serv. Acquisition Corp.,* 486 U.S. 847, 859–60, 108 S.Ct. 2194, 2202, 100 L.Ed.2d 855 (1988). The basis for recusal under section 455(a) is broader than under sections 144 and 455(b)(1). *United States v. Wolfson,* 558 F.2d 59, 62–63 (2d Cir.1977); *Apple,* 829 F.2d at 333. The substantive standard for determining recusal pursuant to section 455(a) is whether a reasonable person, knowing and understanding all the relevant

facts, would conclude that the judge's impartiality might reasonably be questioned. *In re Drexel Burnham Lambert Inc.,* 861 F.2d at 1313; *Lamborn,* 726 F.Supp. at 516; *Pepsico, Inc. v. McMillen,* 764 F.2d 458, 460 (7th Cir.1985). The Court of Appeals has made clear that

> [l]ike all legal issues, judges determine appearance of impropriety—not by considering what a straw poll of the only partly informed man-in-the-street would show—but by examining the record facts and the law, and then deciding whether a reasonable person knowing and understanding all the relevant facts would recuse the judge.

*In re Drexel Burnham Lambert Inc.,* 861 F.2d at 1313.

■ "Section 455(a) was not meant to require disqualification every time one party can make some argument, no matter how unreasonable, that the appearance of prejudice would result." *Lamborn,* 726 F.Supp. at 516. Indeed, a "judge must be alert to avoid the possibility that those who would question his impartiality are in fact seeking to avoid the consequence of his expected adverse decision.... Nothing in the ... legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a 'reasonable fear' that the judge will not be impartial." *Id.* (*quoting* S.Rep. No. 419, 93d Cong., 1st Sess. 5 (1973)). The appearance-of-impartiality test is one of reasonableness; it does not require recusal in response to vague, unsupported or speculative charges of impartiality. *Smith v. Pepsico, Inc.,* 434 F.Supp. 524, 525 (S.D.Fla.1977).

■ In passing on the grounds of personal bias and prejudice, the facts alleged in the affidavit must be accepted as true. *Berger v. United States,* 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921); *United States v. IBM,* 475 F.Supp. at 1379. The judge may not question either the truth of the allegations or the good faith of the affidavit, even if the judge knows to a

---

**14.** *See supra* note 13.

**15.** *See supra* note 13.

certainty that the allegations of personal prejudice are false. *In re Martin–Trigona,* 573 F.Supp. 1237, 1244 (D.Conn.1983), *appeal dismissed,* 770 F.2d 157 (2d Cir. 1985), *cert. denied,* 475 U.S. 1058, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986); *United States v. Boffa,* 513 F.Supp. 505, 509 (D.Del.1981). This statutory obligation, however, does not preclude a court from putting the facts alleged into their proper context and examining the surrounding circumstances. *Rosen v. Sugarman,* 357 F.2d 794, 798 (2d Cir.1966); *United States v. IBM,* 475 F.Supp. at 1379–80; *Lamborn,* 726 F.Supp. at 516.

▉ Furthermore, the requirement of legal sufficiency has been interpreted to mean that the presiding judge must determine whether the reasons and facts stated in the affidavit "give fair support to the charge of a bent of mind that may prevent or impede impartiality of judgment." *Berger v. United States,* 255 U.S. at 33–34, 41 S.Ct. at 233. The affidavit must show a true personal bias and must allege specific facts and not mere conclusions and generalities. *United States v. IBM,* 475 F.Supp. at 1379. "An application for the disqualification of a judge must rest on a factual basis and not on the whim of a litigant who asserts vague contentions." *Hunt v. Mobil Oil Corp.,* 557 F.Supp. 368, 376 (S.D.N.Y.), *aff'd,* 742 F.2d 1438 (2d Cir. 1983). The test is not the subjective feelings or "beliefs" of the movants. *Id.; Markus v. United States,* 545 F.Supp. 998, 1000 (S.D.N.Y.1982), *aff'd,* 742 F.2d 1444 (2d Cir.1983); *United States v. Corr,* 434 F.Supp. 408 (S.D.N.Y.1977); *see* Plaintiff's Affidavit at 8. "There must be factual content to the allegations upon which recusal is sought before a judge's 'impartiality might reasonably be questioned.'" *Hunt,* 557 F.Supp. at 376–77 (*quoting* 28 U.S.C. § 455(a)).

## C. *The Timeliness of Plaintiff's Recusal Motion*

Before reaching the merits of a recusal motion, a court must first consider whether the procedural requirements established by statute have been met.

▉ Section 144 requires a "timely" affidavit to invoke its disqualification procedure. *See Apple,* 829 F.2d at 333.[16] While section 144's mandate that the affidavit be filed "not less than ten days before the beginning of the term" is no longer interpreted literally—because courts now sit continuously—"[i]t is well-settled that a party must raise its claim of a district court's disqualification at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim." *Apple,* 829 F.2d at 333; *see also In re Martin–Trigona,* 573 F.Supp. at 1244 ("One seeking recusal must do so at the earliest moment after he obtains the knowledge that forms the basis for the motion." (quotation marks omitted)); *Lamborn,* 726 F.Supp. at 514 ("earliest possible moment"); *Duplan Corp. v. Deering Milliken, Inc.,* 400 F.Supp. 497, 510 (D.S.C.1975) ("*first opportunity after discovery* of the disqualifying facts" (emphasis in original)).

While section 455 does not explicitly contain a timeliness requirement, the Court of Appeals has applied the same timeliness criteria to motions brought under section 455 as it applies to those brought under section 144, *In re IBM,* 618 F.2d at 932; *National Auto Broker Corp. v. General Motors Corp.,* 572 F.2d 953, 958 (2d Cir. 1978), *cert. denied,* 439 U.S. 1072, 99 S.Ct. 844, 59 L.Ed.2d 38 (1979); *Apple,* 829 F.2d at 333; *see also In re Martin–Trigona,* 573 F.Supp. at 1245, and recusal motions have been denied on the basis of untimeliness even when there has been only a short delay, *see, e.g., id.* at 1244–45 (delay of 12 days); *see also Lamborn,* 726 F.Supp. at 515 (collecting cases).

▉ Plaintiff contends that his Recusal Motion is timely because the court's Order of April 29, 1991 was the last among several elements and "the most significant" element in plaintiff's conclusion that bias or prejudice exists. Plaintiff's Affidavit at 10. However, arguments of this sort for

---

**16.** *See also supra* note 11 (text of statute).

escaping the requirement that recusal motions be filed at the earliest possible moment have not been successful. In *Duplan Corp.*, for example, the affiant questioned a series of remarks made by the court between October 1971 and January 1974. The affidavit was filed on April 1975, and counsel for the moving party attempted to justify the delay by claiming that "the disqualifying facts ... were not appreciated by counsel as showing bias and prejudice until [the] court issued its rulings of November 27 and December 19, 1974." *Duplan Corp.*, 400 F.Supp. at 510. The *Duplan Corp.* court was understandably unpersuaded, holding that the affidavit was untimely and noting that the law "requires that whenever reliance is placed upon the cumulative nature of several disqualifying facts, the moving party must act, after discovery of those facts, with greater expedition than is normally required." *Id.* Similarly, in *United States v. IBM*, 475 F.Supp. at 1377–79, the court held that IBM's affidavit was untimely notwithstanding IBM's counsel's averments that recent decisions and orders by the court caused them only recently to become aware that prior actions of the court had been tainted by bias or prejudice. *See id.* at 1379 (principle that merits of judicial acts should be challenged only on appeal from final judgment, or where permitted, by interlocutory appeal, "is too firmly embedded to yield to an argument that the *cumulative effect of rulings needed to be assayed before a properly supported affidavit could be drawn.*" (emphasis added)); *see also Davis v. Cities Serv. Oil Co.*, 420 F.2d 1278, 1282 (10th Cir.1970) (allegedly cumulative revelation of bias does not justify untimeliness of disqualification motion; "[p]romptness in asserting disqualification is required to prevent a party from awaiting the outcome before taking action."); *Peckham v. Ronrico Corp.*, 288 F.2d 841, 843 (1st Cir.1961) (litigant should not be permitted to "sampl[e] the temper of the court before deciding whether or not to file an affidavit of prejudice"); *United States v. Conforte*, 457 F.Supp. 641, 654 n. 7 (D.Nev.1978) (substantially the same), *aff'd*, 624 F.2d 869 (9th Cir.), *cert. denied*, 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980).

But even if it could be persuasively argued that plaintiff in this case was reasonably unaware of the court's alleged bias until it was "revealed" by the court's most recent ruling—namely, the April 29, 1991 Discovery Order—plaintiff does not, and apparently cannot, explain how the April 29, 1991 Discovery Order can plausibly be characterized as biased or injurious to his interests. Put differently, plaintiff does not explain how an order which *granted in substantial part* plaintiff's motion for additional discovery suggests prejudice against plaintiff, when (1) before the April 29, 1991 Discovery Order was entered, *all* discovery had been stayed pending the first of the bifurcated trials, and (2) at the March 7, 1991 hearing, when inviting from counsel proposed forms of discovery order, the court had stated explicitly and repeatedly on the record its disinclination to permit any further discovery and its concern that plaintiff would use the invitation as an opportunity to attempt again to avail himself of discovery that is not relevant to the first trial. *See* 3/7/91 Tr. at 23–30 (quoted at length above). Placed in context, the court's April 29, 1991 Discovery Order can only be understood as an order substantially to plaintiff's advantage. Had the court maintained the status quo—that is, had the court denied plaintiff's request to reopen discovery—there would be no April 29, 1991 Discovery Order, and plaintiff would therefore be without "the most significant element in [his] conclusion that bias or prejudice exists...." Plaintiff's Affidavit at 10.

Plaintiff's strained effort to characterize the April 29, 1991 Discovery Order as biased against plaintiff seems to be another of plaintiff's seemingly incessant attempts, outlined above, to expand the parameters of the first trial to include issues that have been severed for a second trial on the merits. To be sure, plaintiff's counsel have asserted, and repeatedly re-asserted, their belief that certain discovery issues that the court has held are relevant only to the merits are, in fact, relevant to the statute

of limitations issues as well. This court remains unpersuaded by plaintiff's claim; but, assuming only for the argument that the court had erred in this regard, its error would not in these circumstances constitute sufficient grounds for recusal. It is well settled that the proper time to challenge the merits of judicial acts is on appeal from a final judgment or, where permitted, by interlocutory appeal. *United States v. IBM*, 475 F.Supp. at 1379; *see also Duplan Corp.*, 400 F.Supp. at 514 ("Repeated rulings against a litigant, no matter how erroneous and how vigorously and consistently expressed, are not a basis for disqualification of a judge on the grounds of bias and prejudice."); *cf. Cobbledick v. United States*, 309 U.S. 323, 324, 60 S.Ct. 540, 541, 84 L.Ed. 783 (1940) (appeal will lie only from final decision); *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949) (carving out a small class of orders, now referred to as "collateral orders," which are unrelated to the merits of the underlying claims, and which are immediately appealable as "final decisions" without regard to the posture of the principal litigation). The Supreme Court explained, with reference to the statutory predecessor to section 144, that

> [i]t is a provision obviously not applicable save in those rare instances in which the affiant is able to state facts which tend to show not merely adverse rulings already made, which may be right or wrong, but facts and reasons which tend to show personal bias or prejudice. It was never intended to enable a discontented litigant to oust a judge because of adverse rulings made, for such rulings are reviewable otherwise, but to prevent his future action in the pending cause.

*Ex parte Am. Steel Barrel Co.*, 230 U.S. 35, 43–44, 33 S.Ct. 1007, 1010, 57 L.Ed. 1379 (1913). The basic doctrine was repeated in *Berger v. United States*, 255 U.S. 22, 31, 41 S.Ct. 230, 232, 65 L.Ed. 481 (1921), and has been cited by our Court of Appeals as support for "the general proposition that the bias which requires recusal must be personal and cannot rest upon trial rulings or conduct." *In re IBM*, 618 F.2d at 929. In short, recusal is not and should not be available to a party solely because the party is dissatisfied with a court's adverse rulings.

In any event, the record of this case is clear beyond doubt that the facts assertedly obtained from the court's Order of April 29, 1991—the facts which purportedly provide a basis for Plaintiff's Recusal Motion—were available and apparent well before that date. Plaintiff argues that the court's *granting in substantial part* of his motion to re-open discovery on April 29, 1991 triggered his comprehension that since the time that he filed a Notice of Appeal on October 9, 1990 the court has harbored some bias or prejudice against him.[17] The argument's lack of merit is clear on its face. Indeed, no ruling by this court has been inconsistent with the rulings that *preceded* (and gave rise to) plaintiff's petition for mandamus—the purported source of the court's alleged bias. If plaintiff had an arguably legitimate reason to file a motion to recuse this court on May 20, 1991, then he had no less reason to do so in, for example, August 1990, when the court entered the offending order to bifurcate the trial and to limit discovery to the issues to be addressed in the first trial, or in September 1990, when the court adhered

---

17. Plaintiff's allegations include the following:

A. Six days after lead counsel for defendants, attorney Richard A. Horgan, learned in October of 1990 of the proposed filing by plaintiff of a mandamus petition seeking Court of Appeals review of the Court's unexplained granting of defendants' motion for separate trials of certin [sic] issues selected by them and the wholesale denial of discovery to plaintiff, attorney Horgan in separate telephone calls with each of my principal counsel, urged against such a move because it would anger Judge Cabranes.

B. I did not believe at the time that attorney Horgan's statement had been initiated by Judge Cabranes. I now believe that it was, in light of the subsequent events....

C. Regardless of how attorney Horgan could have known that this exercise of my rights would anger Judge Cabranes, his assertion has been borne out by subsequent events....

Plaintiff's Affidavit at 2; *see also* Plaintiff's Motion for Recusal at 5.

to that ruling after granting Plaintiff's 1990 Motion for Reconsideration. If those rulings—substantially re-affirmed through the subsequent eight months—could be said to reveal prejudice against plaintiff, plaintiff surely could have filed his Recusal Motion well before May 20, 1991. Indeed, at the very latest, plaintiff knew or should have known all that he needed to know at the moment when Plaintiff's May 3, 1991 Letter was submitted to the court, a letter which claimed, among other things, that the court's rulings appeared arbitrary, capricious, and unfairly biased in favor of defendants and which requested additional time in which to file a motion for reconsideration of the April 29, 1991 Discovery Order, but which made no mention of plaintiff's desire to move for the disqualification of this court.

■ This court has previously had the occasion to observe that

[t]he purpose of a timeliness requirement for the assertion of claims of personal bias is to prevent a litigant from using motions to disqualify as dilatory tactics or as means to "sample the temper of the court" before deciding whether to raise an issue of disqualification ... or to ambush a court that is on the verge of acting—possibly to his detriment—on matters he deems important.

*In re Martin–Trigona*, 573 F.Supp. at 1245 (citation omitted). Defendants argue that plaintiff in this case "deferred filing of his recusal motion until he filed his motion for reconsideration so that he could use the threat of this recusal motion in order to attempt to embarrass or intimidate this Court into granting plaintiff further discovery." Defendants' Opposition to Recusal at 17. It is not necessary to characterize plaintiff's motives for filing the recusal motion when he did; regardless of his motive, it is clear that Plaintiff's Recusal Motion must be denied as untimely, for the reasons stated above.

D. *The Requirement that the Bias be Extrajudicial*

Assuming only for the argument that Plaintiff's Recusal Motion is timely, it would nevertheless have to be denied because it is insufficient as a matter of law. The disqualification procedure set forth in section 144 requires that the affidavit filed by a party be legally "sufficient" as well as "timely." [18] Our Court of Appeals has held that sections 144, 455(a), and 455(b)(1) look to *extrajudicial* conduct as the basis for determining whether a judge should disqualify himself, not to "what the judge has learned from or done in the proceedings before him," *King v. United States*, 576 F.2d 432, 437 (2d Cir.1978), or, in other words, conduct which arises within a judicial context. *Apple*, 829 F.2d at 333; *In re IBM*, 618 F.2d at 928–29.

■ A trial judge's alleged prejudice "must arise by virtue of some factor which creates partiality arising outside of the events which occur in the [case] itself." *In re IBM*, 618 F.2d at 927; *see id.* at 928–29; *King*, 576 F.2d at 437. By "extrajudicial conduct" the cases do not mean to say conduct arising geographically outside of the courtroom, but rather, conduct arising from something outside of rulings or statements made by the trial judge in the course of his judicial duties. *Id.; Allen–Myland v. International Business Machs., Corp.*, 709 F.Supp. 491, 494 (S.D.N.Y.1989). The test is the same under both sections 144 and 455: " 'The determination should be made on the basis of conduct extrajudicial in nature as distinguished from conduct within a judicial context.' " *In re IBM*, 618 F.2d at 928 (quoting *Davis v. Board of School Comm'rs*, 517 F.2d 1044, 1052 (5th Cir.1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976)). Or, as the Supreme Court has held, "[t]he alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966). While the Court of Appeals concedes "that conduct in the course of a trial might be relevant to indicate a bias that

**18.** *See supra* note 12 (text of statute).

can only be explained as a personal prejudice against a party, the fact is that no case in this circuit has ever found such bias on the basis of a trial court's rulings or conduct. This reticence ... is well justified." *In re IBM*, 618 F.2d at 928 n. 6.

With perhaps one exception, plaintiff's allegations attempting to show my prejudice and bias are all based on decisions made by me in the normal course in this action.[19] Accordingly, those allegations cannot provide the requisite showing of extrajudicial incidents which might arguably account for the alleged prejudice against plaintiff.

■ In an attempt to locate an extrajudicial source of bias, plaintiff alleges that there is, in essence, an extrajudicial "relationship" between this court and defendants' counsel. Plaintiff provides no factual basis for this claim, asserting simply that the court's rulings lead inescapably to the conclusion that the alleged relationship exists. In a passage whose frenzied and flailing accusations speak eloquently for themselves, plaintiff asserts that,

> Judge Cabranes has been reported to be the least reversed judge in the district. I *believe* that he has ambitions to become an appellate judge, or even a Supreme Court Justice, and is the continuing recipient of academic and other honors. And those capable of assisting in an appointment to confirmation of any further judi-

cial appointment—e.g., the President of the Connecticut Bar Association—are counsel for defendants in this case while my counsel—two out-of-district sole practitioners—cannot aspire to any such influence. These circumstances additionally lead me to believe that Judge Cabranes is biased or prejudiced in this case.

Plaintiff's Affidavit at 8-9 (emphasis added). In light of the fact that the court's alleged extrajudicial interest is, at best, speculative and utterly unsupported by anything but innuendo, it cannot be said to reasonably bring into question this court's impartiality. *In re Drexel Burnham Lambert Inc.*, 861 F.2d at 1313. Accordingly, in the absence of any specific factual allegations, Plaintiff's Recusal Motion on the grounds of bias, prejudice or appearance of impropriety must be denied.

Notwithstanding the absence of factual support, an examination of plaintiff's allegations—and acceptance for the sake of argument only of plaintiff's unfounded and highly dubious premises (both explicit and implicit)—reveals the fatal flaws in plaintiff's arguments.

Plaintiff claims that it was because of an alleged relationship between this court and Attorney Horgan that Attorney Horgan urged plaintiff's counsel not to file a mandamus petition seeking appellate review of this court's rulings of August 1990 because doing so "would anger" the court.[20] Ac-

---

**19.** Plaintiff's Affidavit consists of what can only be characterized as vague, overlapping, and argumentative allegations. In substance, plaintiff's charge of bias and prejudice seems to be based upon the following four general allegations:

1. The court's rulings since October 1990 have disproportionately favored defendants and thus confirmed alleged statements made by lead defense counsel telephonically to plaintiff's counsel in October 1990 that plaintiff's filing of a mandamus petition seeking Court of Appeals review of this court's August 3, 1990 rulings regarding the bifurcation of trials and discovery matters related thereto would "anger" this court. Plaintiff's Affidavit at 2, 8-9. Those rulings include:

 a. This court's denial of plaintiff's request to see the RAAM documents subpoenaed by the court and now held by the court under seal (the "RAAM documents"); Plaintiff's Affidavit at 3-5;

 b. This court's denial of the Bucci Discovery Motion; Plaintiff's Affidavit at 7-8;

2. The April 29, 1991 Discovery Order and the manner in which it was entered suggest *ex parte* consultations between defendants' counsel and this court and bias against plaintiff. Plaintiff's Affidavit at 6-7, 10.

3. By placing the RAAM documents under seal and prohibiting counsel for plaintiffs or defendants from viewing them, this court has obtained personal knowledge of this case which is not known by plaintiff and thus is obligated to disqualify itself under section 455(b)(1). Plaintiff's Affidavit at 5.

4. Defendant MacKinnon contacted plaintiff by letter when I was ill and requested a settlement meeting. Plaintiff's Affidavit at 9-10.

**20.** *See supra* notes 17 & 19 (setting forth plaintiff's allegation).

cording to plaintiff, Attorney Horgan's alleged statement that the petition would anger the court "had been initiated" by this court. Plaintiff's Affidavit at 2. Assuming for the argument that this court did initiate the alleged statement by defendants' counsel to plaintiff that the filing of such a petition "would anger" the court—which, I note parenthetically, is simply untrue—defendants' counsel could have no possible incentive to convey such a message or otherwise dissuade plaintiff's counsel from filing the petition. In fact, defendants' counsel would have every incentive to encourage plaintiff's counsel to push forward with a petition that assertedly would cause the trial court to be hostile to plaintiff or plaintiff's counsel. If defendants' counsel nevertheless conveyed such a message to plaintiff's counsel in response to the court's request, doing so would have been, for the reason already suggested, counter to the interests of defendants' counsel. Plaintiff's speculative allegation therefore boils down to the incoherent claim that I—in the hope of obtaining some alleged advantage—attempted to curry favor with defendants' counsel by requesting him to act in ways that were clearly counter to his own interests.[21]

In any event, plaintiff has failed to meet even the threshold requirement of showing that the source of the alleged prejudice of the court is extrajudicial. Absent some factual support, plaintiff's "beliefs" and fanciful speculations are plainly irrelevant and entitled to no credence; they merely underscore the legal insufficiency of Plaintiff's Recusal Motion.

**E. The Merits of Plaintiff's Recusal Motion**

We may assume for the argument that Plaintiff's Recusal Motion was timely and that the court's alleged bias and prejudice stemmed from an extrajudicial source. Under even those assumptions, however, plaintiff's allegations fail to meet the applicable statutory requirements, *see supra* Section B ("The Relevant Standards for Recusal"). Plaintiff's vague and conclusory allegations[22] that this court is biased in favor of defendants or prejudiced against plaintiff are not sufficient to sustain Plaintiff's Recusal Motion. Although plaintiff's motion clearly should be denied for the reasons already stated, "since the impartiality of the court has been questioned, it is important to address [plaintiff's] contentions on the merits." *Paschall v. Mayone,* 454 F.Supp. 1289, 1300 (S.D.N.Y.1978); *see Lamborn,* 726 F.Supp. at 515.

The inadequacies of plaintiff's allegations may be usefully highlighted by examining what plaintiff contends "is the most significant element of [his] conclusion that bias or prejudice exists"—namely, the April 29, 1991 Discovery Order. Plaintiff's Affidavit at 10. According to plaintiff, this court should recuse itself because of the content of the April 29, 1991 Discovery Order and the manner in which it was entered.

Plaintiff alleges that the court severely restricted the length of Plaintiff's April 17, 1991 Reply. Plaintiff's Affidavit at 7–8; Plaintiff's Recusal Memorandum at 9–11. But as demonstrated above, a reasonable person knowing and understanding all the relevant facts could conclude only that the court afforded plaintiff's counsel ample opportunity to make his views known to the court on the matters at issue.

**21.** In these circumstances, it is perhaps unnecessary to state—but I will state—that I have no extrajudicial relationship of any kind with Mr. Horgan, whom I have met or known only in the formal setting of litigation. In his memorandum in support of recusal, plaintiff refers to "the immediate past President of the Connecticut Bar Association" as one who could assist me in seeking higher judicial office. *See* Plaintiff's Recusal Memorandum at 6. I believe plaintiff may be referring to Mr. Stapleton, who is counsel for defendant Thomas E. Minogue, Jr., and who was President of the Connecticut Bar Asso-

ciation in the recent past. Although I have attended bar association meetings at which Mr. Stapleton was present, I have no personal or private relationship with him of any kind. In sum, I can and do state that I had no ex parte contact with counsel in this case in connection with the April 29, 1991 Discovery Order, or, indeed, in connection with any aspect of this litigation or any other pending litigation or any personal interest of such counsel or any personal interest of mine; I have no personal relationship with any of the lawyers in this case.

**22.** *See supra* note 19.

But even had counsel had no opportunity to brief the issues prior to plaintiff's motion to re-open discovery at the hearing of March 4, 1991, that motion, pursuant to this court's colloquy with counsel on March 7, 1991, was fully submitted and ripe for decision as of the filing of defendants' memoranda of April 12, 1991. *See* 3/7/91 Tr. at 27 (quoted at length above). The court could have ruled then. *See also* Rule 9(a)1 of the Local Rules of Civil Procedure (D.Conn.) (making no allowance for the submission of "reply" memoranda).

On April 17, 1991, plaintiff moved for (and, on April 19, 1991, the court granted plaintiff) leave to file Plaintiff's April 17, 1991 Reply which was attached to the motion. Plaintiff does not claim to have been, nor was he, prohibited from moving for permission to file a reply memorandum of more than four pages. Plaintiff's Recusal Memorandum (but *not* Plaintiff's Affidavit) does claim, however, that plaintiff's counsel were advised by my law clerk that their reply should not be more than five pages. Plaintiff's Recusal Memorandum at 9. Even assuming that claim to be true, a law clerk's *advice* is of no relevance to plaintiff's claim. But even were a law clerk's advice equivalent to an order from this court, Plaintiff's April 17, 1991 Reply was only *four* pages in length; either plaintiff had no more than four pages to offer or plaintiff was acting in accordance with a completely self-imposed space restriction. In either case, one cannot conclude that there was a meaningful court-imposed restriction on plaintiff's reply, much less that plaintiff was not afforded an opportunity to present his view of the issues to this court.

The fact that the court later granted defendants' motion for leave to file a sixteen-page surreply memorandum cannot be said to reflect bias in favor of defendants. It reflects the fact that the defendants requested (and were granted) leave to file a sixteen-page surreply, nothing more.

Defendants argue that their "sur-reply was 16 pages long because Plaintiff's April 17, 1991 Reply contained so many false statements against not only defendants but their counsel, that defendants were not able to address in fewer pages all the false charges and the discovery issues involved." Defendants' Opposition to Recusal at 23. One may put aside defendants' explanation for the length of their surreply and simply observe that Defendants' Revised Proposed Discovery Order is *more* favorable to plaintiffs than was Defendants' First Proposed Discovery Order. *Each and every one of the revisions that are contained in Defendants' Revised Proposed Discovery Order is to plaintiff's benefit*—that is, each revision gives plaintiff more of the discovery than was requested in Plaintiff's April 5, 1991 Memorandum and Proposed Order. Ironically, it is this fact which appears to be the basis for plaintiff's conclusion that there exists some sort of conspiratorial relationship between defendants' counsel and the court. In plaintiff's words, the revisions included in Defendants' Revised Proposed Order "were added at the suggestion of the Court, who no doubt concluded that the restrictions initially proposed by defendants were so outrageous as to be unsustainable." Plaintiff's Affidavit at 11.

Plaintiff's claim is simply too weak and speculative to suggest, much less support, plaintiff's conclusion. To begin with, the "restrictions initially proposed" by defendants (that is, Defendants' First Proposed Discovery Order) were neither outrageous nor unsustainable; as reviewed above, the court had, prior to the submission of any proposed orders from either side, stated in no uncertain terms that it was inclined, based on the record, to prohibit any further discovery until after the first trial. *See* 3/7/91 Tr. at 15, 23–30 (quoted at length above). Thus, not only was Defendants' First Proposed Discovery Order sustainable, it was quite generous.

Moreover, there is nothing suspect about the fact that Defendants' Revised Proposed Discovery Order is more favorable to plaintiff than is Defendants' First Proposed Discovery Order. Plaintiff's counsel seem not to recognize that efforts at compromise and cooperation like those made by defendants' counsel are expected of lawyers in circumstances such as these. Rule 26(f)(5) of the Federal Rules of Civil Procedure, for instance, provides that, with regard to an

attorney's discovery motion, that motion should contain

> [a] statement showing that the attorney making the motion has made a reasonable effort to reach agreement with opposing attorneys on the matters set forth in the motion. Each party and each party's attorney are under a duty to participate in good faith in the framing of a discovery plan if a plan is proposed by the attorney for any party.

Likewise, Rule 9(d)(4) of the Local Rules of Civil Procedure (D.Conn.) encourages cooperation between counsel, providing in pertinent part that no discovery motion "shall be filed unless counsel making the motion has conferred with opposing counsel and discussed the discovery issues between them in detail in a good faith effort to eliminate or reduce the area of controversy, and to arrive at a mutually satisfactory resolution." Defendants' submission of the Revised Proposed Discovery Order is, if anything, evidence of a good faith attempt on the part of defendants' counsel to "eliminate or reduce the area of controversy." And that conclusion is only bolstered by defendants' sixteen-page surreply memorandum which explains, in uncomplicated terms, defendants' reasons for revising their proposed discovery order.

With respect to the April 29, 1991 Discovery Order, plaintiff also objects specifically to the addition of paragraph 5, which provides as follows:

> Defendants Communications Design Corporation and Oliver P. MacKinnon, Jr., are hereby ordered to review their files for documents referring or relating to the development and marketing of COM–NET or revenues CDC obtained for COM–NET from any of its customers during 1978–82 and to produce forthwith any such documents which have not previously been produced to the plaintiff.

Plaintiff asks: "Why in the world would defendants add such a provision as Paragraph 5 under these circumstances except insofar as the Court had directed that the order be conditioned upon this provision?" Plaintiff's Affidavit at 10–11 (quotation marks and brackets omitted). Placing plaintiff's allegation in context—assuming plaintiff's rhetorical question constitutes an allegation—the source of Paragraph 5 becomes obvious. Defendants' counsel is responding to the following accusation made earlier, in Plaintiff's Reply Memorandum: "it is an outrageous misstatement on the part of Mr. Horgan that 'CDC and MacKinnon have produced every requested 1981–82 document related to CDC's customers' revenues and expenses.' ... MacKinnon's testimony and CDC's production of records (overseen by Mr. Horgan personally according to his client's testimony) have been incomplete." Plaintiff's Reply Memorandum at 2–3. Again, defendants' revision appears to be no more suspect than an attempt to eliminate an area of controversy.

Plaintiff also claims to find bias and prejudice on the part of this court from the fact that defendants included the following sentence in Defendants' April 29, 1991 Surreply:

> Being mindful of this Court's March 7, 1991 suggestion that defendants consider what discovery they would be willing to allow plaintiff to conduct in the hiatus before the first trial, defendants are agreeable to the non-party discovery set forth in defendants' revised proposed order (submitted herewith) if the Court directs that it be conditioned as set forth in such proposed order and limited to a period of two months.

Defendants' April 29, 1991 Surreply at 1. Plaintiff contends that the addition of the phrase "defendants are agreeable" and the phrase "if the Court directs that it be conditioned" demonstrate that the changes in Defendants' Revised Proposed Discovery Order were "directed" and "conditioned" by the court in an *ex parte* communication with defendants. Plaintiff's Recusal Memorandum at 10–11. In its best light, plaintiff's claim here is incomprehensible. This court does not understand how the inclusion of respectful language by defendants' counsel in their memorandum to the court can be said to constitute evidence of anything more than defendants' counsel's intent to be respectful. Indeed, the phrase "if the Court directs" suggests, if anything, that there was no *ex parte* communication with defendants' counsel. For had

there been, there would presumably be no uncertainty on defendants' part as to whether and what "the Court directs."

■ Finally, plaintiff suggests that the fact that the court entered Defendants' Revised Proposed Scheduling Order (thereafter the April 29, 1991 Discovery Order) on the same day that it was filed constitutes a "breach of procedural due process [that] is explainable only by personal bias or prejudice." Plaintiff, however, does not, and can not, explain what due process entitlement was breached. Plaintiff's implied argument seems to be that the court should have contacted plaintiff's counsel to determine whether they had any objection to defendants' Revised Proposed Order, *see, e.g.*, Plaintiff's 1991 Motion for Reconsideration at 5–6 ("*Without asking for the plaintiff's response,* . . . the Court accepted the Sur–Reply for filing and also signed defendants' revised order on that date." (emphasis added)), notwithstanding the fact that the underlying motion had been ripe since April 12, 1991. To put the matter another way, if the court had not acted on the motion before receiving a request from plaintiff for leave to file a reply to defendants' surreply, the court would not, according to plaintiff's argument, have been permitted to deny that request without violating plaintiff's right to procedural due process. It appears, therefore, that the only way for the court to have avoided violating plaintiff's claimed procedural due process entitlement was to ensure that plaintiff had the final word. The law affords no such entitlement.

But even if it did, plaintiff's "entitlement" was not violated. Plaintiff, it will be recalled, had already replied to defendants' First Proposed Form of Order. *See* Plaintiff's April 17, 1991 Reply. And, as noted above, every revision to Defendants' First Proposed Discovery Order that was added to Defendants' Revised Proposed Form of Order was *to plaintiff's benefit.* The only objections that plaintiff might have had to Defendants' Revised Proposed Discovery Order, therefore, would have already been made in Plaintiff's April 17, 1991 Reply. In other words, with regard to the April 29, 1991 Discovery Order, there was nothing new to which plaintiff could object to which he had not already objected.[23]

But even if there were, plaintiff is indisputably incorrect to assert that he and his counsel were given "no opportunity to address the revised form." As provided under applicable rules, plaintiff was free to file—indeed, plaintiff *has* filed—a motion for reconsideration of the April 29, 1991 Discovery Order. *See* Rule 9(e), Local Rules of Civil Procedure (D. Conn.); *see also* Plaintiff's Motion for Reconsideration; Court Order of May 7, 1991[24] (entered prior to Plaintiff's Recusal Motion and granting plaintiff's motion for an extension of time in which to file a motion for reconsideration of the April 29, 1991 Discovery Order or for other relief). Plaintiff's counsel have several times previously filed motions for reconsideration and the court has each time granted them.[25]

---

**23.** That plaintiff had no new objections to Defendants' Revised Proposed Scheduling Order is clearly evidenced by the fact that, except for plaintiff's contention that this court is biased against him, Plaintiff's Motion for Reconsideration contains no new arguments or objections that plaintiff had not previously made (often several times).

It is worth noting the circularity of plaintiff's argument here: The objection that he is now offering to Defendants' Revised Proposed Scheduling Order is, at bottom, that the court is prejudiced against him; and the court's prejudice is, in turn, supposedly revealed by the fact that plaintiff was not afforded an opportunity to object to Defendants' Revised Proposed Scheduling Order. In short, therefore, plaintiff's position is that he had no new objection until, and but for the fact that, the April 29, 1991 Dis-

covery Order was entered before he objected to it. Or, put differently, had plaintiff objected to it, he would have had no objection.

**24.** The full text of this order is reproduced in note 4, *supra* at 1519–20.

**25.** Plaintiff's Affidavit contains other allegations. *See supra* note 19. But plaintiff himself readily concedes that the other allegations are comparatively insignificant. *See* Plaintiff's Affidavit at 10. In light of all that has been said above, there is simply no purpose to be served by addressing each of plaintiff's allegations on an individual basis. Judicial resources are not infinite, and plaintiff has already received more process than is due. Lest plaintiff wrongly conclude, however, that his other allegations are worthy of additional consideration, he may feel

## CONCLUSION

### A. *Motion to Recuse*

For the reasons stated above, Plaintiff's Recusal Motion is denied because (1) it is untimely; (2) even if we assume for the argument that it was timely, Plaintiff's Affidavit fails adequately to allege any extrajudicial source that can be said to give rise to a disqualifying prejudice on the part of this court; and (3) even if we assume for the argument that plaintiff's recusal motion was timely *and* plaintiff had adequately shown an extrajudicial source of prejudice, plaintiff has failed to sustain his burden of showing even an *appearance* of bias, as required by section 455(a), the most liberal standard for recusal.[26]

In Plaintiff's Recusal Reply Memorandum, plaintiff asks:

> What harm can be done by permitting a party to believe he is getting a completely impartial judge? "Trying the case by one judge rather than another, neither party nor counsel having voice or influence in the designation of that other" can in no way result in unfairness to either party.

Plaintiff's Recusal Reply Memorandum at 35 (citing *Berger v. United States*, 255 U.S. 22, 35, 41 S.Ct. 230, 233, 65 L.Ed. 481 (1921)). As the record of this case plainly reveals, the harm to which plaintiff refers would be substantial. Taking increasingly extreme measures, plaintiff has occupied well over a year bombarding defendants' counsel and this court—not to mention the Court of Appeals and the chambers of Chief Judge Burns—with letters, motions, memoranda, and affidavits, in the hope of finding a way to undo the court's decision bifurcating the trial and limiting discovery. Having made what appears to be every conceivable effort to recharacterize and reargue his requests to this court for additional discovery, plaintiff is now—with apparently nothing to lose—taking any step that is arguably available to him to obtain a different judge, in the hope that doing so will permit him to obtain, in turn, a different result. But as the Court of Appeals has recently emphasized, "[i]n deciding whether to recuse himself, the trial judge must carefully weigh the policy of promoting public confidence in the judiciary against the possibility that those questioning his impartiality might be seeking to avoid the adverse consequences of his presiding over their case." *In re Drexel Burnham Lambert, Inc.*, 861 F.2d at 1312 (citation omitted). As the record of this case shows, plaintiff appears to be engaged in a transparent scheme to avoid the adverse consequences of the court's discovery rulings. Granting Plaintiff's Recusal Motion under these circumstances would not only be wrong, but it would also undermine public confidence in the judiciary, for the judiciary would appear easily manipulated by any litigant who is prepared to claim that a court is biased, no matter how speculative and fanciful the allegations. In this case, therefore, both fundamental policy objectives—the promotion of public confidence in the judiciary and the prevention of judge-shopping under the guise of a motion to recuse—are served by the denial of Plaintiff's Recusal Motion.

### B. *Motion for Reconsideration, or in the Alternative, for Certification*

Plaintiff's Motion for Reconsideration is granted. Upon reconsideration of the record as a whole, the court adheres in substantial part to the April 29, 1991 Discovery Order. *See* Amended Discovery Order entered today.

Plaintiff's motion in the alternative to certify questions for appeal pursuant to 28 U.S.C. § 1292(b) ("section 1292(b)")[27] is denied. For the court to certify on appeal any of plaintiff's suggested questions,[28] the

---

free to review the arguments to the contrary offered by defendants, *see* Defendants' Opposition to Recusal; Defendants' Surreply to Recusal, which the court finds persuasive.

26. In other words, plaintiff has failed to show that a reasonable person knowing and understanding all the relevant facts would conclude that I should recuse myself.

27. *See supra* note 2 (setting forth relevant portion of section 1292(b)).

28. Plaintiff requests that the following questions be certified:

> (1) In this case, was it proper to deny to plaintiff any effective non-party discovery under the Federal Rules?

court must find that the plaintiff has satisfied three requirements: (i) that the issues involve "a controlling question of law"; (ii) "as to which there is substantial ground for difference of opinion"; and (iii) that "an immediate appeal from the order may materially advance the ultimate termination of the litigation." Section 1292(b); *State Teachers Retirement Bd. v. Fluor Corp.*, 84 F.R.D. 38, 39 (S.D.N.Y.1979).

■■■■■ A certification pursuant to Section 1292(b) is to be used only in extraordinary cases where a decision might avoid protracted and expensive litigation and should not be used merely to provide review of difficult rulings in hard cases. *United States Rubber Co. v. Wright*, 359 F.2d 784, 785 (9th Cir.1966). Moreover, an order granting or denying discovery is ordinarily a non-appealable interlocutory order which is reviewable only upon final judgment or order and in the circumstances presented does not involve such a controlling question of law as to allow immediate appeal under section 1292(b). *Browning Debenture Holders' Comm. v. DASA Corp.*, 524 F.2d 811, 817–18 (2d Cir.1975); *Bourget v. Government Employees Ins. Co.*, 48 F.R.D. 29, 36 (D.Conn.1969).

Plaintiff has satisfied none of the requirements for certification of any of plaintiff's questions. Indeed, plaintiff has offered neither law nor argument in support of his contention; the mere submission of questions to be certified is not sufficient. Nor is plaintiff's conclusory assertion that "this Court's April 29, 1991 [Discovery Order] ... involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of this litigation." Plaintiff's Recusal Reply Mem-

orandum at 14. While there may well be other means of materially advancing the ultimate termination of this case, it is clear, in light of this record, that certifying plaintiff's questions pursuant to section 1292(b) is not one of them.

It is so ordered.

## APPENDIX

### DISCOVERY ORDER

Upon review of the memoranda and proposed orders submitted by plaintiff and defendants under dates of April 4, 12, 16 and 29, and upon review of the prior proceedings in this action, it is hereby ORDERED THAT:

1. Plaintiff and defendants shall be entitled to conduct additional discovery in this action, including depositions with subpoenas duces tecum, subject to the limitations and conditions set forth in this Order.

2. All discovery pursuant to this Order shall be limited to the following three issues severed for a separate trial by this Court's Order of August 6, 1990: fraudulent inducement, fraudulent concealment and the existence of a fiduciary relationship between the plaintiff and defendant Oliver P. MacKinnon, Jr. and/or defendant Thomas E. Minogue, Jr.

3. Discovery pursuant to this Order shall be limited solely to the persons set forth in the list attached to this Order and limited to one individual from any given corporate deponent. Discovery from all but the first four persons listed on the attached list shall be limited to "information constituting and leading to evidence of 1981 circumstances and background of the relationships between McCann and MacKinnon and MacKinnon and Lennon," as

(2) In this case, can the Court actively withhold from plaintiff evidence such as the RAAM invoices, which plaintiff contends are necessary to enable him to prove his case?
(3) Did the Court in this case have authority to prohibit plaintiff from obtaining non-proprietary evidence through informal cooperation by a non-party?
(4) Does fraudulent concealment under Connecticut and federal law no longer include breach of a fiduciary duty to disclose?

(5) Was the Court correct in entirely denying to plaintiff any discovery under the Federal Rules from defendant WESTCOM, which has ownership and custody of many of the most important records in the case, and whose statute of limitations defense remains factually unexplained in discovery?
Plaintiff's Recusal Reply Memorandum at 4–5.

requested by the plaintiff. Any subpoenas duces tecum issued pursuant to this Order for all but the first four persons on the attached list shall also be subject to this limitation.

4. All discovery pursuant to this Order shall be subject to this Court's Orders dated June 9 and October 4, 1989 directing *inter alia,* that no further discovery shall be allowed of third parties by the plaintiff of any computer program tapes, listings, codes or other proprietary computer program designs or related information. In the event plaintiff seeks discovery of any documents or information deemed by any defendant to be confidential proprietary information belonging to defendants, plaintiff shall afford defendants an opportunity to inspect and remove such information prior to its production to plaintiff. Upon notice and for good cause shown, the Court may review the appropriateness of any defendant's designation of documents or information as constituting confidential proprietary information.

5. Defendants Communications Design Corporation and Oliver P. MacKinnon, Jr. are hereby ordered to review their files for documents referring or relating to the development and marketing of COM–NET or revenues CDC obtained for COM–NET from any of its customers during 1978–82 and to produce forthwith any such documents which have not previously been produced to the plaintiff.

6. All discovery pursuant to this Order shall be completed within two months of the date of this Order.

7. Any discovery of whatever documents have been or may be produced to this Court by RAAM Information Services, Inc. or its successor in interest in response to the subpoena issued pursuant to this Court's Order of March 5, 1991 shall remain filed under seal with this Court subject to the terms of such Order and to the conditions and limitations set forth in this instant Order.

SO ORDERED.

Dated at New Haven, Connecticut, this 29th day of April, 1991.

*List of Persons From Whom Plaintiff and Defendants May Have Discovery*

1. Kathleen Matthews
2. Elizabeth L. Olbreys
3. Gioia Ambrette
4. Custodian of Plaintiff's Employment/Personnel Records at Data General Corporation
5. Ralph Hayes/TELE–TRAN
6. Brandon Systems, Inc.
7. Mordecai Spira
8. Michael Starr
9. Foster Wheeler Energy Group
10. Seagram & Sons